Filed 5/9/14  P. v. Avila CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JUAN HUMBERTO AVILA,<br><br>    Defendant and Appellant. | G048673<br><br>(Super. Ct. No. 10CF3246)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, W. Michael Hayes, Judge.  Affirmed.

Richard De La Sota, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

We appointed counsel to represent Juan Humberto Avila on appeal. Counsel filed a brief that set forth the facts of the case. Counsel did not argue against his client but advised the court he found no issues to argue on Avila's behalf. Avila was given 30 days to file written argument on his own behalf. That time has passed, and Avila did not file a supplemental brief.

Counsel filed a brief following the procedures outlined in *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*). The court in *Wende* explained a *Wende* brief is one that sets forth a summary of proceedings and facts but raises no specific issues. (*Id.* at pp. 438, 439.) Under these circumstances, the court must conduct an independent review of the entire record. When specific issues are raised by the appellant himself in a *Wende* proceeding, we must expressly address them in our opinion and explain why they fail. (*People v. Kelly* (2006) 40 Cal.4th 106, 110, 120, 124 (*Kelly*).) Here, Avila did not file a supplemental brief raising any issues.

Counsel advised this court that he had thoroughly reviewed the record in this case and was unable to identify an arguable issue on appeal. He further advised this court that a staff attorney at Appellate Defenders, Inc. had also reviewed the record. But pursuant to *Anders v. California* (1967) 386 U.S. 738, to assist the court with its independent review, counsel provided the court with information as to issues that might arguably support an appeal. Counsel raised three questions: (1) was there sufficient evidence to support Avila's convictions; (2) did the court commit reversible error by excluding expert testimony regarding the frequency with which women falsely claim to have been raped and the reasons for making such false claims; and (3) did the court commit reversible error by allowing the prosecution to prove the prior convictions alleged against Avila after the jury that determined the question of guilt had been discharged. We have reviewed the record in accordance with our obligations under *Wende* and *Anders,* and found no arguable issues on appeal. The judgment is affirmed.

2

## PROCEDURAL HISTORY

A jury convicted Avila of one count of forcible sexual penetration in violation of Penal Code section 289, subdivision (a)(1)[1] (count 1), two counts of rape in violation of section 261, subdivision (a)(2) (counts 2 and 3), two counts of forcible sodomy in violation of section 286, subdivision (c)(2) (counts 4 and 5), two counts of forcible oral copulation in violation of section 288a, subdivision (c)(2) (counts 6 and 7), and one count of forcibly attempting to dissuade a witness from reporting a crime in violation of section 136.1, subdivisions (b) and (c)(1) (count 8).  The jury also convicted Avila of one count of grand theft from the person in violation of section 484 as a lesser included offense of the robbery originally charged in count 9.  The jury found true allegations as to counts 1 through 7 that Avila kidnapped the victim and inflicted great bodily injury upon her within the meaning of section 667.61, subdivisions (a), (b), and (e)(1) and (3).  The prosecution alleged Avila was convicted of a prior serious felony as a strike, and as a prior serious felony within the meaning of section 667, subdivision (a).  The prior convictions were bifurcated from the trial on counts 1 through 9 and the jury that convicted Avila was discharged without any action having been taken on that allegation.

A few days later, the prosecution raised the issue of the trial on the prior conviction allegation.  Avila objected to a trial on the prior conviction allegation being heard after the original jury was discharged.  The court overruled the objection.  Avila then waived his right to a jury trial on the prior and agreed to have a court trial on that issue during the already-scheduled sentencing date of June 14, 2013.  On June 14, 2013, the trial court found the allegation that Avila had previously been convicted of a serious felony true.

---

[1]        All further statutory references are to the Penal Code.

The trial court then sentenced Avila to a total term of 363 years to life in state prison as follows. The court sentenced Avila to consecutive terms of 25 years to life for each of the charges in counts 1 through 7, and doubled each of those terms for Avila's prior strike to seven consecutive terms of 50 years to life. The court imposed the high term of four years for count 8 and doubled that to a consecutive term of eight years. The court imposed a concurrent upper term sentence of three years for count 9. Finally, the court imposed a consecutive five-year term for Avila's prior conviction pursuant to section 667, subdivision (a). Avila timely appealed.

FACTS

In January 2008, Dulce T. (Dulce) and her boyfriend, Jose T., met at about 6:00 p.m. and went to a friend's house. Dulce was 16 years old and a senior in high school. While there, they watched movies and smoked "pot" with three or four others. About midnight or 1:00 a.m., Dulce and Jose T. left on foot. They walked down Bristol Street until they got to Central Street where Jose T. left Dulce to walk to his house. When they went their separate ways, Dulce was speaking to her mother on her cellular telephone. Jose T. watched Dulce until she turned and he lost sight of her. He then walked home. Dulce was supposed to call him when she got home, but she never did.

When Dulce left Jose T., she texted an ex-boyfriend named J.C. and told him she was frightened. He then called her. While still on the cell phone with J.C., a man she had never seen before came out from behind a sign and hit her in the face. She screamed and dropped her phone. Her glasses were knocked off her face. J.C. heard a "yell," a "commotion," and an adult male voice that he thought said, "Get in." J.C. tried to call Dulce back but did not get an answer. He called her parents and told them what he had heard.

When the man first hit Dulce, Dulce was near the corner of Main Street and Warner Avenue in Santa Ana. The man struck Dulce two or three more times in the face and dragged her in a "bear hug[]" up Main Street to a parking lot across the street behind

4

a medical building out of sight from the street. In the parking lot, the man started to unbuckle Dulce's pants. When she tried to stop him, he kneed her in the ribs, pulled down her pants, and digitally penetrated her. He then pulled down his own pants. While Dulce was on her feet, but bent over at the waist, the man penetrated Dulce's vagina and anus with his penis, then grabbed her by the hair and forced her to her knees and placed his penis in her mouth. He then repeatedly switched between penetrating her anally and vaginally and forcing her to orally copulate him. Throughout the various assaults, the man threatened to kill Dulce.

After the repeated assaults, the man told Dulce to take her pants off, lie on her back, and cover her face, saying, "'Let me fuck you and I'll let you go.'" While Dulce was in that position, he orally copulated her and penetrated her vagina with his penis again. The man finally told Dulce to put on her pants and give him her identification. She did not have a photo identification and that made the man angry. He asked her for her address, and she told him what it was. She also gave him $60 or $80 and her ATM card. He told her that if she said anything, his "'homeys from Delhi will fuck you up and they'll fuck up your family too.'" Dulce knew Delhi was a violent street gang from that area. She believed the threat and was frightened by it. Before leaving, the man who attacked Dulce told her to lie down and count to 100. While she was doing that, he came back and threatened her with retribution again. After she finished counting to 100, she got up and ran home, where she told her sister what had happened. Her sister called the police. A responding police officer, Brandon Sontag, observed Dulce to be nervous and shivering. Her clothing was disheveled and appeared to have been torn from her body, and her face was "tear-streaked." Dulce described her attacker as a male Hispanic, 5'6" to 5'8" and 180 to 200 pounds with a "chunky" build. He had a tattoo of something that looked like an animal head on his left shin, and long sideburns.

5

Dulce had never seen her attacker before, did not know him, and did not agree to have sex with him. She did not know Avila, and had never had consensual sex with him. Dulce had bruising to her left eye, a cut under that eye, a cut to her upper lip from which she still had a scar when she testified, and multiple abrasions to her labia and posterior fourchette at the six o'clock position. Oral, vaginal, and anal swabs were taken from her during a sexual assault examination.

Soon after the attack, an investigator with the Santa Ana Police Department, Michael Maiocco, went to the parking lot where the attack took place and found blood drops on a block wall in that area. He took a swab of the blood. He also went to the corner of Main Street and Warner Avenue, where he located Dulce's glasses and cell phone. Almost one year later, Fidencio Zepeda, a sex crimes investigator for the Santa Ana Police Department, received information that a DNA match had been made between the swabs taken from Dulce and someone named Juan Avila. On that same date, he contacted Avila at his home at 2238 South Towner in Santa Ana, which was "just down the street" from Main Street and Warner Avenue, and contacted Avila. Avila was 5'11" in height, weighed about 240 pounds, and had a tattoo on his shin.

The parties stipulated the Orange County Crime Lab examined the vaginal and anal swabs taken from Dulce and they revealed the presence of semen and spermatozoa. Genetic profiles were developed from those swabs. The profile from the vaginal swab was the same as the profile from the rectal swab. Both genetic profiles were from the same male individual. A DNA sample was taken from Avila after his arrest. The genetic profile developed from Avila's sample matched the profile developed from the swabs taken from Dulce. Further DNA testing revealed the blood sample taken from the block wall at the crime scene was Dulce's. Finally, the parties stipulated Avila had never been affiliated with the Delhi street gang but he knew that it was a violent street gang that claimed as part of its territory the area where the crimes charged in this case occurred.

Barbara Richard testified for the defense. She was a mental health service coordinator at Orange County Health Center. The center was a locked facility and was the psychiatric emergency room for Orange County. It was located at 1030 West Warner, which was a "little bit east of Bristol" about a half-mile from Main Street and Warner Avenue. While she did not bring any records pertaining to the release of and specific patients on the day of the offense, she testified patients can be released from the facility at any time of the day or night.

Monte Miller also testified for the defense. Miller testified he owned and operated a business called "Forensic D.N.A. Experts." He was an expert in the field of crime scene investigation and serology. He examined the evidence developed in this case, including witness statements, photographs, and the crime lab file, and he went to the scene itself. He testified it was very common to find semen in an anal/rectal sample when only vaginal intercourse has been reported. Based on photographs of the blood spatter on the wall, Miller opined the splatters were consistent with the victim having suffered blunt force trauma or punch to the face. Miller found no evidence of such an injury in the reports he reviewed. Miller also testified as to a lack of evidence of various aspects of the victim's account including no evidence of Dulce being dragged on Main Street towards Broadway Avenue, no evidence of an assault on that stretch of Main Street, and no evidence Avila was in the parking lot with Dulce.

Miller further testified the evidence that Avila's semen was found inside Dulce's vagina was evidence there had been a sexual encounter between them. He would have expected to see staining on Dulce's underwear if she had taken part in sexual activity within an hour of the underwear being collected, and no such stains were documented in this case.

Corporal Galen Diaz of the Santa Ana Police Department testified for the defense. He went to the crime scene at 2222 South Main Street in Santa Ana on the day of the offense. He saw blood splatter on a block wall and blood on the ground in an area

7

by some containers in the parking lot at that location. Bloodhounds were called in, and they went south on Main Street.

Jonathan Nieto testified, also called by the defense, that in January 2008 he worked with Avila at Club Vegas in Costa Mesa. Nieto was a security guard at the club and Avila was also a security guard and a "deejay hype man." He would announce the deejay on stage and "get[] the crowd going." On the evening of the offense, Nieto and Avila went to a belated Christmas party hosted by the owner of Club Vegas at Sharkeez in Newport Beach. Before the party, they had been at a co-worker's house drinking. They went to Sharkeez at about 6:00 p.m. and continued drinking. Avila got into a fight in the rest room and cut his elbow so that it was bleeding "profusely." Avila was "kicked out" of Sharkeez at about 8:30 p.m. When Avila left, he was intoxicated.

Between 2008, the time of the offense, and the time Nieto testified in February 2013, it appeared Avila had lost some weight and trimmed his goatee. Avila did not have long sideburns when Nieto knew him in 2008. Nieto saw Avila around women and he was not violent or aggressive towards them.

Dr. Veronica Thomas testified for the defense she was a clinical and forensic psychologist with a private practice in Tustin. She conducted a psychosexual assessment of Avila. As part of that assessment, Thomas interviewed Avila in the jail for six or seven hours and administered psychological testing that was designed to detect the presence of sexual deviance, including sexual aggression, and rape. She found Avila was "defensive," which was not unusual. Thomas also concluded Avila did not have sexually aggressive character traits. She did find, however, that he was a "philanderer," meaning a person who is in a relationship with one person but who continues to have a sexual interest in others, and for whom sexual conquests are an important part of feeling good about themselves. While Avila worked in a setting that brought him into contact with many women who were intoxicated and otherwise impaired, he did not have any history of "violent predatory behavior toward women."

8

Thomas was aware of reports Avila's wife or girlfriend, Diana Avila (Diana), had called the police alleging Avila had assaulted her on more than one occasion. However, the reports did not document any sexual violence toward Diana, and Thomas concluded from those reports Avila had a "problematic relationship at home."

Dr. Richard Abeyta was a chiropractor called by the defense. Starting about six months before the offense, he treated Avila for neck and back pain resulting from an automobile accident. At that time, Avila was 5'11" tall and weighed 200 pounds. He released Avila from treatment five months later and recommended he not lift anything over 35 pounds. He last treated Avila about two weeks before the offense for a "flare-up" of lower back pain. He did not see Avila after that date.

Diana testified for the defense that she was Avila's wife. They met in 2003 and were married in May 2008 when their daughter was born. In December 2010, she called the police because Avila threw something and hit her ankle. She and Avila had arguments throughout their relationship over his going out with other women. "Many years" before the 2010 incident, Avila slapped her, and she called the police. She told police they had many altercations involving pushing and shoving. She also told police she was bleeding from the slap because she had braces. She did not tell the police that was the worst beating he had ever given her, but that it was the worst physical altercation they had. She called the police in October 2010 because she had been looking through his Facebook account and thought he was planning to meet another woman and confronted him about it. He punched her in the arm and told her if she did not stop questioning him about what he was doing, he would show her what a real beating was. She was not a citizen of the United States, and he threatened to have her deported and her baby taken from her. Diana believed she could be deported.

The day before the offense, Diana slept at Avila's home on Towner Street. She was pregnant at the time. He lived in a "little studio" behind the main house in which his parents lived. On the morning of the incident, he took her to her mother's

9

house and dropped her off. She remembered the dates because they had an argument about the late Christmas party he was going to. She did not believe he was going to a party but was going to see another woman. Diana called Avila at about 10:00 p.m. and he sounded drunk. She told him to bring back her car – which he had been driving – because it was getting late. He picked her up at her mother's house at about 11:00 p.m. He was drunk and bleeding from his elbow. She drove. They stopped at a Del Taco and returned to his place on Towner Street at about midnight. He threw up and went to bed at about 12:30 a.m. She awoke at about 8:00 a.m., and Avila was next to her.

After Avila was arrested in this case, he spoke to Diana on the telephone from jail. During one of the calls from jail, Avila told her, "'everybody I work with, they're with me from 9:00 at night, 10:00 at night, all the way up to like midnight, 1:00, like midnight, 12:30, 1:00. And then I was with you for the rest of the evening. You know what I'm saying?'" In another of the conversations, Diana said that although she knew Avila could not have committed the crime he was arrested for because he was with her, she told him that she was "'trying not to believe everything I'm reading.'"

Judy Malmgren, a registered nurse and certified sexual assault nurse examiner, testified for the defense. Malmgren testified she had reviewed the photographs of Dulce taken at her sexual assault examination, the records of that examination, and the police reports prepared in connection with the case. The abrasions to Dulce's posterior fourchette at the six o'clock position were consistent with Dulce being on her back when those injuries were sustained. Had Dulce been penetrated from behind, Malmgren would have expected to see some abrasions to the same area at around the 12 o'clock position. She also would have expected to see some staining to Dulce's underwear had sperm been deposited in her vagina within an hour or so of the underwear having been collected, but she saw no mention of any such staining in the reports. Finally, Malmgren would expect to see some redness or swelling to the anus had Dulce been anally penetrated, but she did not see any such evidence in the photographs of Dulce's anal area.

10

Avila testified that when the police took him into custody, they told him it was because of a rape of a 16-year-old girl at the corner of Main Street and Warner Avenue. He could not "figure out" what they were talking about because he would not do anything like that. When he got into the auto accident in 2007, he weighed about 200 to 210 pounds. After that, he did not exercise as he had, he stopped being careful about what he ate, and his weight "ballooned." Avila could grow "sporadic" whiskers on his sideburn area, but nothing that would "look like sideburns or a beard."

As a teenager, Avila lived at 2238 South Towner in Santa Ana with his parents. The Alley Boys gang claimed that territory. A gang called Dehli claimed the area around Main Street and Warner Avenue. They were rival gangs. He had friends who were members or associates of the Alley Boys gang. They all lived in the same neighborhood. People were initiated into the gang by being beaten or "jump[ed] in." He hit his wife, but that was not part of the "jumping in" process. In fact, physical violence toward women and raping them is "frowned upon" in the gang culture. One could be killed for raping a woman. When he was 19 years old, he was arrested on a firearm charge. He pled guilty as part of a plea bargain that involved three years' probation and a guarantee of no jail time. As part of the plea bargain, he admitted to being an active participant in the Alley Boys gang. He was not a member of Alley Boys in January 2008. He stopped associating with the gang after his arrest in 1996.

Avila met his wife Diana when he was 24 or 25 years old. At the time he had a son from a previous relationship. He always had girlfriends. He never forced them to have sex or mistreated them physically, although he could say some "mean" things. He was unfaithful to his wife, Diana, throughout their relationship. They had physical altercations as well. She would accuse him of being unfaithful, which was true, and there would be pushing and shoving. He once slapped her, and, on another occasion punched her in the arm. He started working at Club Vegas as a bouncer in March 2006. He also

11

worked at Club Glam, which was in a club called J.C. Fandango in Anaheim, until November 2007, when it lost its lease and closed.

When he was arrested, he had no recollection of the day of the offense. He later recalled the date because of a professional football playoff game and the belated Christmas party at Sharkeez. On the day of the offense, he dropped Diana off at her mother's at about 11:00 a.m. He was driving her Nissan Altima. She was angry and suspicious about the party later that night. After he dropped Diana off at her mother's, Avila began distributing flyers about a promotion at another club called Club Arrows. He had lunch at about 2:00 p.m. and afterwards "ran into Dulce," whom he knew from Club Glam. They recognized each other and hugged. Avila and Dulce then drove into a nearby parking lot and smoked some "weed" or "pot." While they were smoking they did something called a "shotgun toke" where one person would inhale the smoke and then exhale it into the other the other person's mouth. That led to them kissing and ultimately having intercourse in the back seat of the car. Avila stated the entire encounter lasted for about 15 minutes. Avila believed he ejaculated. They had undressed from the waist down to have sex. They then got dressed and "parted ways."

Avila testified that while he was at the party at Sharkeez later that evening, he got into a fight in the men's restroom, which resulted in a gash on the point of his elbow. He left Sharkeez and went to another person's house and "crashed" on his couch until he got a call from his "then girlfriend/wife." Avila drove to Diana's house and they went to a Del Taco after 11:00 p.m., and then back to his house on Towner Street. He watched television and "passed out." He did not leave again that night. He was not at the corner of Main Street and Warner Avenue or at the parking lot where the assault on Dulce took place that night. He did not force Dulce to have sex with him. He did not see Dulce between the time they had sex in the back seat of his wife's car and the trial.

12

Avila also sought to call psychologist Laura Brody as an expert witness. The defense indicated Doctor Brody would testify as to why a person might falsely claim rape. The court refused to allow Avila to call Brody for this purpose.

## DISCUSSION

The fact counsel filed the opening brief under *Wende* confirms he does not believe the listed issues are arguable. When appellant raises specific issues in a *Wende* brief, we must expressly address those issues in our opinion. (*Kelly, supra,* 40 Cal.4th at pp. 110, 120, 124.) In this case, Avila did not file a supplemental brief. We have reviewed the record in accordance with our obligations under *Wende* and *Anders* and considered the issues listed by counsel. We find no arguable issues on appeal.

## DISPOSITION

The judgment is affirmed

O'LEARY, P.J.

WE CONCUR:

ARONSON, J.

FYBEL, J.